FILED

UNITED STATES DISTRICT COURT

MAY 2   2000

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

CLERK

| | | |
|---|---|---|
| THE STURGIS AREA CHAMBER OF COMMERCE and THE CITY OF STURGIS, SOUTH DAKOTA, | ) ) ) ) | Civ. 00-5023-KES 2000 DSD 26 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | MEMORANDUM OPINION AND ORDER |
| STURGIS RALLY & RACES, INC. and STURGIS BIKE WEEK, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

[¶1]     The Sturgis Area Chamber of Commerce and the City of Sturgis bring this infringement action against Sturgis Rally & Races, Inc., and Sturgis Bike Week, Inc.  This matter is before the court on motions for preliminary injunctions filed by both parties. Following an extensive hearing, and for the reasons stated below, the court holds that the Chamber's service marks, "Sturgis Rally & Races," "Black Hills Motor Classic," and "Black Hills Motorcycle Rally" have attained secondary meaning in conjunction with the solicitation of official sponsors for the motorcycle event held in and around Sturgis, South Dakota, the first full week in August every year, and grants plaintiffs' motion for preliminary injunction and denies defendants' motion for preliminary injunction.

## FINDINGS OF FACT

[¶2]     Plaintiff Sturgis Chamber of Commerce is a South Dakota nonprofit corporation having a mailing address of P.O. Box 504, Sturgis, South Dakota.  Plaintiff City is a municipal corporation in the state of South Dakota with its principal place of business located at 1147 Sherman Street, Sturgis, South Dakota.

[¶3]     Defendants Sturgis Rally & Races, Inc., and Sturgis Bike Week, Inc., are South Dakota for-profit privately held corporations, each having a mailing address of P.O. Box 189, Sturgis, South Dakota and each having a principal place of business located at 990 Main Street. Sturgis Bike Week, Inc., is in essence a successor corporation to Sturgis Rally & Races, Inc.

[¶4]     Virtually every year since 1938, motorcycle races and other motorcycle-related activities have been held in and around Sturgis, South Dakota, during the first full week of August.  This event, initially labeled as the Black Hills Motor Classic, has become known by many names, including "Sturgis," "Sturgis Rally," "Sturgis Rally and Races," "Sturgis Bike Week," and "the Rally."

[¶5]     During the Rally, the City closes four to five blocks of Main Street for use only by motorcycle traffic.  Estimates of attendance at the 1999 Rally include 275,000 to 300,000 people.  Main Street is an important element of the Rally, with nearly all people attending the Rally experiencing the "Main Street Event" or the "Main Street Happening."  In comparison, 11,000 to 12,000 people attended the Sturgis Dragway races during the 1999 Rally, anywhere from 100 to 1000 people attended the Jackpine Gypsies races, tours, and hikes, and approximately 1,500 to 15,000 attended the concerts .

[¶6]     Early in Rally history, a nonprofit corporation, Black Hills Motor Classic, Inc., undertook the management of the Rally.  In 1984, when the Sturgis Chamber of Commerce hired a full-time executive, the Board of Black Hills Motor Classic, Inc., transferred its Rally management function to the Chamber to relieve volunteer board members after years of service and "because no sales tax would be chargeable against ticket sale revenues." Exhibit 17.  The Chamber managed the Rally until 1992.

[¶7]      In 1986, Tom Monahan designed a logo and donated it to the Chamber to generate Rally revenue to support the Chamber's activities and Sturgis community programs.  First used in 1987 and federally registered in 1996, the Chamber's logo has been utilized, deemed, and widely advertised as the official logo of the Rally continuously and consistently by plaintiffs, and through a license agreement by defendant Sturgis Rally & Races, Inc., its past and present shareholders, and its past and present officers.  The Chamber has licensed others to use its logo and has prosecuted the trademark against unauthorized users.

[¶8]      In 1990, the Chamber committee evolved into the Black Hills Motor Classic Board for the purpose of managing the Chamber's involvement in the Rally.  The composition of the Board included a position appointed by the Jackpine Gypsies, a position appointed by the City, a position appointed by the local business owners, and two positions appointed by the Chamber.  The Board shared office space and a part-time secretary with the Chamber.  After discussions concerning the obscenity at and lack of leadership of the Rally, the idea of a consortium emerged.  The nonprofit corporation, Black Hills Motor Classic Consortium, Inc., was formed in 1991, consisting of the Chamber, the City, the National Motorcycle Museum, Sturgis Dragway, and the Jackpine Gypsies Motor Club, "to promote the City of Sturgis, South Dakota, and its environs by facilitating better planning, organizing and promoting of the city of Sturgis and the Black Hills Motor Classic Event."  Exhibit 1.  This group addressed the problems of the Rally, pooled their resources, and solicited sponsors for the Rally.  The consortium wanted potential sponsors to understand they were not just getting main street, they were sponsoring the Rally.  Exhibit 106.  Until this time, Sturgis Dragway and the Jackpine Gypsies solicited sponsors only for their individual races and events occurring during the Rally.

-3-

[¶9]     Finding the Black Hills Motor Classic name cumbersome, the consortium conducted a phone survey which indicated by a nine-to-one ratio that people calling to inquire about the Rally knew it by the name "Sturgis Rally" instead of the Black Hills Motor Classic.  The consortium adopted the name "Sturgis Rally" and added "Races" at the request of the Jackpine Gypsies.

[¶10]     Seeing no benefits in continuing as a nonprofit corporation and seeing potential benefits of the Sturgis Rally and Races name recognition, members of Black Hills Motor Classic, Inc., incorporated as the for-profit corporation Sturgis Rally & Races, Inc., consisting of the Chamber, the City, the National Motorcycle Museum, Sturgis Dragway, and the Jackpine Gypsies Motor Club.  Exhibit 12.  The purpose of Sturgis Rally & Races, Inc., is to "promote the City of Sturgis, South Dakota, and its environs by facilitating better planning, organizing and promoting of the city of Sturgis and the Black Hills Motor Classic Event." Exhibit 2.

[¶11]     In 1992, Sturgis Rally & Races, Inc., and each plaintiff signed three-year consortium/entity agreements assigning all sponsorship and promotional benefits as they related to the Rally to Sturgis Rally & Races, Inc.  In return for plaintiffs' exclusive assignments, Sturgis Rally & Races, Inc., agreed to compensate each shareholder "in a ratio equal to the amount that each shareholder paid yearly to Sturgis Rally & Races, Inc., to provide managerial and marketing expertise to promote sponsorship and promotional benefits." Exhibit 5.  In the initial consortium/entity agreements, Sturgis Rally & Races, Inc., acknowledged that the Chamber owns the official logo and the proprietary designations of "Black Hills Motor Classic" and "Sturgis Rally & Races."

[¶12]      The National Motorcycle Museum discontinued its membership of Sturgis Rally &

Races, Inc., in 1992, while the Jackpine Gypsies discontinued their membership in 1994.

Exhibit 12.  Some of the former members of the Jackpine Gypsies incorporated as Rally

Events, Inc., and this entity then became a shareholder of Sturgis Rally & Races, Inc., offering

"official racing and touring events for the Rally."  Id.

[¶13]      In November of 1994, each plaintiff signed a three-year consortium/entity agreement

with Sturgis Rally & Races, Inc., which included terms similar to the 1992 agreement.  In

addition, the Chamber's agreement included a license and assignment to Sturgis Rally &

Races, Inc., of the exclusive use of its "Officially Licensed Logo" and the names "Black Hills

Motor Classic," "Sturgis Rally & Races," and "Black Hills Motorcycle Rally and Races" for

the term of the agreement.

[¶14]      When the issue of whether the City could own stock in a private corporation arose in

1995, the nonprofit Foundation for the Residents of Sturgis was formed.  The Foundation

became the owner of the City's shares of stock, receiving 25 percent of the profits from Sturgis

Rally & Races, Inc., to fund community projects.  The City and Sturgis Rally & Races, Inc.,

signed a superseding agreement indicating that the City would pay Sturgis Rally & Races, Inc.,

$1,916.67 each month for managerial, coordination, and promotional services for the Rally and

that the City would pay Sturgis Rally & Races, Inc., a 20-25 percent  management fee for

rental of the City's property.

[¶15]      During the consortium/entity agreement contractual period, Sturgis Rally & Races,

Inc., solicited official sponsors for the Rally, provided planning, organization, and promotion

of the Rally, managed licenses of the Chamber's logo and "wording owned" by the Chamber,

enforced the Chamber's trademark against unauthorized third-party use of the Chamber's

marks, published the Rally News, and managed City property.  Exhibits 10 &12.  Sturgis Rally & Races, Inc.'s official sponsorship packages ranged in price from $30,000 to $100,000 for signage, hospitality packages, product exclusivity rights, advertising, and the designation as an official sponsor.

[¶16]     Sturgis Rally & Races, Inc., also licensed users of the official (Chamber's) logo on tangible products through separate licensing agreements.  In the licensing agreements which were offered to licensees, Sturgis Rally & Races, Inc., acknowledged that the Chamber is the owner of the logo and the "protected language."  It also acknowledged that the Chamber's "[p]roperty has a secondary meaning in the minds of the public."  Exhibit 34.

[¶17]     After the expiration of the 1994 agreement, the parties continued to operate "essentially within the 1994 contract" throughout the 1998 and 1999 Rallies.  Exhibit 113.  During that period, Sturgis Rally & Races, Inc., continued to act as the Chamber's agent and acknowledged the Chamber's ownership of the proprietary marks by soliciting and issuing licenses to third parties and paying royalties to the Chamber.

[¶18]     Sturgis Rally & Races, Inc., was notified on August 18, 1999, that the Chamber was terminating their relationship as of September 30, 1999, and would be entertaining proposals for a new promotional agreement.  The Chamber urged Sturgis Rally & Races, Inc., to propose a new agreement for marketing and promotion, license management, and logo protection procedures, but Sturgis Rally & Races, Inc., declined.

[¶19]     A dispute arose between the Chamber and Sturgis Rally & Races, Inc., as to whether they had a continuing enforceable contractual relationship.  A settlement agreement was signed by Sturgis Rally & Races, Inc., and the Chamber on November 15, 1999, indicating that "any contractual relationship between the Parties that might arguably exist shall be considered

terminated effective September 30, 1999, and any and all claims to an ongoing contractual relationship or breach thereof made by SR&R shall be forever relinquished, waived and discharged."  The Chamber paid Sturgis Rally & Races, Inc., $25,000 and allowed Sturgis Rally & Races, Inc., to purchase its 250 shares of Sturgis Rally & Races, Inc., stock for one dollar per share.

[¶20]     Before the settlement agreement was signed and while the Chamber was still a shareholder of the Sturgis Rally & Races corporation, and without the knowledge, consent, or authority of the Chamber, Sturgis Rally & Races, Inc., filed applications with the state of South Dakota and received state registrations for the marks "OFFICIAL SPONSORS OF STURGIS," "PROUD SPONSORS OF STURGIS," "OFFICIAL PRODUCTS OF STURGIS," "OFFICIAL STURGIS LOGO PRODUCTS," and "STURGIS MOTORCYCLE EXPO." Exhibit 78.

[¶21]     On September 10, 1999, the City signed an exclusive managerial and marketing agreement with Champion Sports Group, a North Carolina corporation, in which Champion agreed to provide the City with promotion and coordination services of the Rally.  Exhibit 79. The Chamber also signed an exclusive license agreement with Champion Sports Group in February 2000, in which Champion agreed to provide managerial and marketing services of the Rally for the Chamber, and the Chamber granted Champion a license of the Chamber's marks for its use in soliciting sponsors and otherwise promoting the Rally.

[¶22]     On March 2, 2000, Sturgis Rally & Races, Inc., notified vendors that Sturgis Rally & Races, Inc., was purchased by Bob Davis, Gary Lippold, and Francie Ruebel-Alberts, that it had purchased the Sturgis Bike Week federal trademark, and that it would now be doing business as Sturgis Bike Week, Inc.  STURGIS BIKE WEEK is a trademark currently

registered to Virginia Rhodes with the United States Patent and Trademark Office, No. 2,070,955 for "clothing, namely, t-shirts and caps in Class 25." Exhibit 80. Sturgis Rally & Races, Inc., has signed a purchase agreement with Virginia Rhodes, but the trademark has not yet transferred to Sturgis Bike Week, Inc. When it commissioned a logo for Sturgis Bike Week, Inc., Sturgis Bike Week, Inc., took the Chamber's logo to its graphic designer.

[¶23]     Despite the City and Chamber's agreements with Champion, Sturgis Rally & Races, Inc., has continued to identify itself as the promoter of the Rally. Specifically, in April 2000, Sturgis Rally & Races, Inc., distributed fliers indicating that

> Sturgis Rally & Races, Inc. is proud to announce its name change to Sturgis Bike Week, Inc. Only the name has changed, not the people. We are the same people that have been here for the past eight years. PLUS! We still publish the Sturgis Rally News Magazine & the Rally Guide. If you have any questions . . . give us a call at our same number . . . or e-mail us at srr@sturgisrallyandraces.com.

Exhibit 70.

[¶24]     Sturgis Bike Week, Inc., offered Dodge Truck Co. a $30,000 sponsorship agreement for the 2000 Sturgis Bike Week, designating Dodge Truck Co. as a sponsor of the 2000 Sturgis Bike Week and allowing its use of the language: "Proud Sponsor of Sturgis Bike Week" and granting the use of "Sturgis Bike Week." If Dodge Truck Co. desires to use "Sturgis Bike Week" on any tangible product, however, it must execute a separate licensing agreement.

[¶25]     The use of Sturgis Bike Week, Inc., in the electronic media has caused instances of confusion. Sturgis Bike Week, Inc., utilizes the web address www.sturgisrallyandraces.com. Its website displays the Chamber's Black Hills Motor Classic service mark, designates the website as the "Official Guide" to the hottest motorcycle event in the world, and indicates that Sturgis Rally & Races "represents the residents of Sturgis, the business community and racing organizations." Exhibit 78. As of March 10, 2000, the website proclaims that Sturgis Rally &

Races, Inc., is the manager for the Chamber's trademarks.  Exhibit 63.  In addition, e-mails have been misdirected.  An e-mail directed at Sturgis Bike Week, Inc., was sent to the Champion website and e-mails inquiring about the licensing procedure of the Chamber's marks were directed to Sturgis Bike Week, Inc.  Exhibits 64 & 68.

[¶26]     Evidence also indicates other instances of actual confusion.  When Champion presented a sponsorship program to Ford Trucks after Sturgis Rally & Races, Inc., had already solicited it for a 2000 sponsorship, Ford was confused as to which entity was the source of sponsorships for the City and Chamber.  When Champion solicited Zippo Manufacturers to become an official sponsor for the 2000 Rally, Zippo said that it was renewing its sponsorship agreement with Sturgis Rally & Races, Inc.  Zippo then notified Sturgis rally vendors that "Zippo is an official corporate sponsor of the 2000 Sturgis Rally & Races."  In addition, when Champion solicited Harley Davidson as a sponsor for the 2000 Rally, Harley Davidson wanted a contract with the City and Chamber, but was confused as to whether Champion or Sturgis Rally & Races, Inc. represented those entities.

## DISCUSSION

[¶27]     Plaintiffs' motion for a preliminary injunction requests that the court enjoin defendants' unauthorized use of service marks which include the term "STURGIS" when used in conjunction with the promotion or sponsorship of activities relating to the annual races, rallies, and other motorcycle-related exhibits, promotions, competitions, concerts, and related activities commonly known as the Sturgis Rally & Races.  Defendants contend that plaintiffs have not established that they will suffer irreparable harm if defendants are not enjoined, that plaintiffs have failed to establish a likelihood of success on the merits, and that the harm to plaintiffs is outweighed by potential harm to defendants.

[¶28]    A preliminary injunction is an extraordinary equitable remedy for which the movant bears a heavy burden.  Dakota Indus., Inc. v. Ever Best Ltd., 944 F.2d 438, 440 (8th Cir. 1991).  For a preliminary injunction to issue, the court must balance (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of the hardships; and (4) the public interest.  Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (citing United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1178-79 (8th Cir. 1998); Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).  When weighing these factors, "no single factor is in itself dispositive." Calvin Klein Cosmetics v. Parfums de Coeur, Ltd., 824 F.2d 665, 667 (8th Cir. 1987).  "[A]ll factors must be considered to determine whether the balance weighs towards granting the injunction."  Id.  In addition, a "court should flexibly weigh the case's particular circumstances to determine whether the balance of the equities so favors the movant that justice requires" court intervention.  Hubbard, 182 F.3d at 601.

[¶29]    **I.    Likelihood of Success on the Merits**

[¶30]    "To prevail under the Lanham Act, plaintiff[s] must prove that defendants' use of the name [Sturgis Bike Week, Inc., and the use of the Sturgis Bike Week logo in connection with the solicitation of sponsorships for the Rally] creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers [of the services] as to the source of or association between the two [logos]."  Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1096 (8th Cir. 1996).

[¶31]    The court's initial inquiry as to whether a preliminary injunction may issue is whether plaintiffs can show a probability of success on the merits of their infringement claim.  To show a probability of success on the merits, plaintiffs must demonstrate that defendants' use of their

-10-

own service mark will cause a likelihood of confusion to ordinary buyers of its services as to whether plaintiffs have sponsored, endorsed, or are otherwise affiliated with the defendants' services. Hubbard Feeds, 182 F.3d at 601. The likelihood of consumer confusion is the "hallmark of any trademark infringement claim." Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc., 130 F.3d 1305 (8th Cir. 1997) (quoting Polymer Technology Corp. v. Mimran, 37 F.3d 74, 80 (2d Cir. 1994)).

[¶32]    To determine whether a likelihood of confusion exists, the court must consider (A) the strength of the marks; (B) the similarity between the parties' marks; (C) the competitive proximity of the parties' [services]; (D) Sturgis Rally & Races, Inc.'s and/or Sturgis Bike Week, Inc.'s intent to confuse; (E) evidence of actual confusion; and (F) the degree of care reasonably expected of potential customers. Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1096 (8th Cir. 1996) (citing Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 774 (8th Cir. 1994), cert. denied, 513 U.S. 1112, 115 S. Ct.. 903, 130 L. Ed. 2d 787 (1995)).

[¶33]    **A.  Strength of the Mark**

[¶34]    The first factor for the court to consider is whether plaintiffs' marks are strong or weak. The strength, or distinctiveness, of a trademark is its power to identify the source of a product or services. Time, Inc. v. Petersen Publishing Co., 173 F.3d 113 (2d Cir. 1999). Defendants argue that the Chamber's service marks lack secondary meaning and are invalid and unenforceable.

[¶35]    In the usual trademark case, the court would initially complete an analysis to determine whether plaintiffs' mark is arbitrary or fanciful, suggestive, descriptive, or generic and strong enough to merit trademark protection. In this case, however, the court finds that

defendants admitted by testimony and documentary evidence that the Chamber owns the logo and the language "Sturgis Rally & Races," "Black Hills Motor Classic," and "Black Hills Motorcycle Rally & Races," and that the language has secondary meaning in the marketplace. Exhibit 33. Plaintiffs contend that as former service mark licensees, defendants are estopped from challenging the ownership or validity of the marks it has licensed. The court agrees. See Heaton Distrib. Co. v. Union Tank Car Co., 387 F.2d 477, 482 (8th Cir. 1967); Seven-Up Bottling Co. v. Seven-Up Co., 561 F.2d 1275, 1279 (8th Cir. 1977).

[¶36]    In Heaton, the Eighth Circuit Court of Appeals found that even in the absence of any contractual provision preventing the licensee from contesting the validity of the trademark, a "dealer, in recognizing the manufacturer as the owner of the trademark . . . under the terms of the agreement [is] estopped to claim otherwise." Heaton, 387 F.2d at 482. The court also found it immaterial whether the agreement was enforceable or not because it was due to the actions of the defendant that Heaton was entitled to injunctive relief and damages.

[¶37]    In this case, as in Heaton, it is the actions of defendants that entitle plaintiffs to an injunction. The court finds that the doctrine of licensee estoppel should be applied because defendants admitted that Sturgis Rally & Races, Inc., licensed the marks from the Chamber; Sturgis Rally & Races, Inc., admitted in numerous documents that the Chamber owned the logo and the service marks; Sturgis Rally & Races, Inc., sub-licensed the marks back to the Chamber and prohibited it from using the logo without the consent of Sturgis Rally & Races, Inc.; Sturgis Rally & Races, Inc., paid the Chamber royalties from that license; Sturgis Rally & Races, Inc. included a disclaimer in most of its advertising that the marks were owned by the Chamber; and Sturgis Rally & Races, Inc., enforced the marks from unauthorized third-party use.

-12-

[¶38]    The court finds that Sturgis Bike Week, Inc., is also estopped from challenging the ownership or validity of the marks it has licensed.  When Sturgis Rally & Races, Inc., was purchased by Bob Davis, Gary Lippold, and Francie Ruebel-Alberts, the name was changed to Sturgis Bike Week, Inc.  Sturgis Rally & Races, Inc., notified potential vendors, potential sponsors, and the general public that "Sturgis Rally & Races, Inc. will now be doing business as Sturgis Bike Week, Inc."  Exhibits 50 & 70.  In addition, Sturgis Bike Week, Inc., utilizes the same web address, the same phone number, the same staff, the same postal address, the same officers, the same personnel, and offers the same services as Sturgis Rally & Races, Inc.  Therefore, Sturgis Bike Week, Inc., cannot avoid the application of licensee estoppel just because it changed its name from Sturgis Rally & Races, Inc., to Sturgis Bike Week, Inc.  See Parker v. Western Dakota Ins., Inc., 605 N.W.2d 181 (S.D. 2000).  (When the purchaser corporation is merely a continuation of the seller corporation or when the transaction amounts to a consolidation or merger of the purchaser and seller corporations, the continuing corporation acquires the seller corporation's liabilities.)

[¶39]    Because of the foregoing discussion, the court finds that relevant protected marks are the Chamber logo, "Sturgis Rally & Races," "Black Hills Motor Classic," and "Black Hills Motorcycle Rally & Races," and that the because of the strength of the Chamber's marks, they are entitled to protection under the Lanham Act.  This factor weighs toward the finding of a likelihood of confusion.

[¶40]    **B.   The Similarity Between the Parties' Marks**

[¶41]    The second factor the court must consider to ascertain whether a likelihood of confusion exists is whether the parties' marks are similar.  In determining whether the parties' marks are similar, the court "must evaluate the impression that each mark in its entirety is

-13-

likely to have on a purchaser exercising the attention usually given by purchasers of such [services]." <u>Duluth News</u>, 84 F.3d at 1097. "Where the [services] are closely related, less similarity in the trademarks is necessary to support a finding of infringement." <u>SquirtCo. v. Seven-Up Co.</u>, 628 F.2d 1086, 1091 (8th Cir. 1980) (citing <u>David Sherman Corp. v. Heublein, Inc.</u>, 340 F.2d 377, 380 (8th Cir. 1965)).

[¶42]    Although the court must evaluate the marks in their entirety, it is noteworthy that the person commissioned to design the Sturgis Bike Week, Inc., logo was given the Chamber logo before it designed the Sturgis Bike Week, Inc., logo. Even though testimony indicated that the designer was told to make a logo that did not look like the Chamber logo, each logo is round in shape, each has the word "Sturgis" dominant in the top of the bottom half of the logo, each has a portion of an "S" extending beyond the circle, each has a patriotic symbol directly above "Sturgis," and each contains a phrase commonly used in describing the Rally on the bottom quarter of the logo. "The use of dominant identical words in common does not mean that two marks are similar." <u>Duluth News-Tribune v. Mesabi Publishing Co.</u>, 84 F.3d 1093, 1096 (8th Cir. 1996) (citing <u>General Mills, Inc. v. Kellogg Co.</u>, 824 F.2d 622, 626 (8th Cir. 1987)). However, evidence indicates that to the relevant public, Bike Week is synonymous with Rally & Races and motorcycles are commonly referred to as bikes. The court finds that these logos connote the same mental images. Furthermore, even though visual dissimilarities exist between the marks, the court finds that given the similarities previously described and the circumstances under which the logos are used, the marks are sufficiently similar so that prospective purchasers are likely to believe an association exists between plaintiffs and defendants. Therefore, this factor weighs toward the finding of a likelihood of confusion.

-14-

[¶43]      **C. The Competitive Proximity of the Parties' Services**

[¶44]     The third factor to consider in determining whether there is a likelihood of confusion is the similarity of the products and services the parties offer. "The greater the similarity between products and services, the greater the likelihood of confusion." Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 202 (5th Cir. 1998). Both parties utilize their logos for services in the solicitation of sponsorships for the Rally, for promotion of the Rally, and for licensing products. The court finds that the parties are in direct competition. This factor weighs toward the finding of the likelihood of confusion.

[¶45]      **D. The Alleged Infringer's Intent to Confuse**

[¶46]     The fourth factor to be considered in the determination of whether the likelihood of confusion exists is defendants' intent to "pass off" their services as those of plaintiffs. "Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion," but "[i]f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion." Elvis Presley Enter., 141 F.3d at 203. An "inference of intent is strengthened when the parties have had a prior relationship, because '[s]uch a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's good will.'" Insty*Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 671 (8th Cir. 1996).

[¶47]     Evidence indicates that Sturgis Bike Week, Inc., has intended to confuse purchasers of its services. For instance, Sturgis Bike Week, Inc., sent notices to former and potential vendors and sponsors with SR&R in big letters on the top left corner and the Sturgis Bike Week, Inc., logo on the top right corner indicating "[o]nly the name has changed . . . we are the same people . . . call us at the same phone number." In addition, an intent to "pass off" can

-15-

be inferred when Sturgis Rally & Races, Inc., registered the marks "OFFICIAL SPONSORS OF STURGIS," "PROUD SPONSORS OF STURGIS," "OFFICIAL PRODUCTS OF STURGIS," "OFFICIAL STURGIS LOGO PRODUCTS," and "STURGIS MOTORCYCLE EXPO" with the South Dakota Secretary of State.  Furthermore, Lippold, Davis, and Reubel-Alberts chose a corporate name synonymous for the Rally, just like the consortium did when it chose the name Sturgis Rally & Races, Inc.  An inference can be made that in choosing a name synonymous with the Rally, Sturgis Bike Week, Inc., intended potential sponsors to believe that it had the same authority to solicit official sponsorships of the Rally on behalf of plaintiffs.  As testimony indicated, defendant Sturgis Rally & Races, Inc., could have named its new corporation Lippold, Davis, Reubel-Alberts, Inc., which would have been easily distinguishable from Sturgis Rally & Races, Inc.  Potential sponsors could have easily distinguished the new corporation from Sturgis Rally & Races, Inc.  It is doubtful, however, that potential sponsors would pay thousands of dollars for signage indicating that  "Dodge welcomes you to the Lippold, Davis, Reubel-Alberts Rally."  By using the name Sturgis Bike Week, Inc., the corporation intended to deceive potential sponsors into thinking defendants still had authority to solicit official sponsorships on behalf of the Chamber and the City.

[¶48]      In addition, further intent to deceive can be inferred by Sturgis Rally & Races, Inc.'s taking the Chamber's logo to the designer.  Certainly, if the designer had never seen the Chamber's logo, the odds that the logos would have so many characteristics in common would be astronomical.  By physically taking the logo to the designer and requesting a different logo, Sturgis Bike Week, Inc., ensured that its logo would resemble the Chamber's mark in some aspects.

[¶49]     Furthermore, Sturgis Bike Week, Inc., mailed fliers to former sponsors and vendors indicating that "only the name has changed" but failed to indicate that it no longer was an agent of the Chamber and City.  Sturgis Bike Week, Inc., has also demonstrated an intent to deceive and confuse the relevant public as to the origin and sponsorship of its services by soliciting the same sponsors and the same vendors, using the same street address, the same web address, and the same phone number as it did when it used the name Sturgis Rally & Races, Inc., and solicited sponsors and vendors on behalf of the Chamber and City.

[¶50]     The Sturgis Bike Week, Inc., web site is also evidence of intent to deceive by indicating on the website that vendors will receive "the same service [they] have come to expect from [them]," and that Cindy Swenby has been with the company for over six years, even though Sturgis Bike Week, Inc., only recently came into existence.  As of March 10, 2000, the Sturgis Bike Week, Inc., website indicated that Sturgis Rally & Races, Inc., was still the manager of the Chamber's trademarks.  In addition, Sturgis Bike Week, Inc., proclaims that this is the 60th annual Sturgis Bike Week in its logo, in its correspondence, and on its website. The Rally may be in its 60th year of existence, but Sturgis Bike Week, Inc., is not. Accordingly, the court finds that Sturgis Bike Week, Inc., has intended to confuse and deceive potential consumers of its services as to the affiliation, origin, and sponsorship of its services. This factor weighs toward the finding of a likelihood of confusion.

[¶51]     **E.   Evidence of Actual Confusion**

[¶52]     The fifth factor the court must consider in the determination of whether a likelihood of confusion exists is evidence of actual confusion.  Although plaintiffs are not required to prove any instances of actual confusion, "when determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion."

-17-

Continental Distilling Sales Co. v. Brancato, 173 F.2d 296, 298 (8th Cir. 1949); Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1098 (8th Cir. 1996) (quoting Life Technologies, Inc. v. Gibbco Scientific, Inc., 826 F.2d 775, 777 (8th Cir. 1987)). Manifestations of actual confusion serve as strong evidence of a likelihood of confusion. Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 400 (8th Cir. 1987).

[¶53]    Evidence of actual confusion was presented at the hearing.  When Ford Trucks was solicited by Champion, it required a conference call with the City and the Chamber to verify that Champion did represent those entities.  Ford was confused because it had been solicited previously by Sturgis Rally & Races, Inc., which failed to disclose its terminated relationship with plaintiffs.  In addition, when Zippo Manufacturing was solicited by Champion, it indicated that it was renewing its sponsorship with Sturgis Rally & Races, Inc., and notified vendors that it "is an official corporate sponsor of the 2000 Sturgis Rally & Races."  Evidence also indicated that Harley-Davidson was confused as to whether Sturgis Rally & Races, Inc., was approved by and affiliated with the City.

[¶54]    The J & P Cycles letters, however, indicate "confusion as to who was running the rally," disdain for the negative publicity generated by the two separate entities soliciting sponsorships, and by what it perceived as the City trying to trademark the name "Sturgis." This evidence indicates a distinction between the entities, not confusion as to the source of the services.

[¶55]    Overall this factor weighs in favor of a finding of a likelihood of confusion.

[¶56]        **F.   The Degree of Care Reasonably Expected of Potential Customers**

[¶57]    The final factor for the court to weigh in determining whether there is a likelihood of confusion is the degree of care reasonably expected of potential customers.  In evaluating this

factor, the court must consider the degree of care expected of an ordinary purchaser. Duluth

News-Tribune, 84 F.3d at 1096. Sponsorships for the Rally can range from tens of thousands

of dollars to over one hundred thousand dollars. Exhibit 23. Evidence indicates that potential

sponsors are sophisticated buyers. Although Ford Trucks and Harley-Davidson were initially

confused, they each took the time to inquire as to with whom they were dealing and what

authority that entity yields. This may not be the case, however, for potential sponsors who

were not contacted by Champion prior to their contracting with defendants. Most of the

potential sponsors may have been contacted by or contracted with defendants when Sturgis

Rally & Races, Inc., represented the Chamber and the City, and may not scrutinize defendants'

credentials or disclaimers as closely as they would have if a prior relationship between

plaintiffs and defendants had not existed. This factor weighs neither for or against a finding of

a likelihood of confusion.

[¶58]      **G.   Weighing the Factors of Confusion**

[¶59]      Of the six factors the court must consider to determine if there is a likelihood of

confusion, only the sophistication of the buyers does not weigh in favor of a finding of a

likelihood of confusion. This factor is outweighed by the strength of the marks, the similarity

of the marks and logos, the direct competition between the parties, defendants' intent to

confuse, and the incidents of actual confusion. Therefore, the court finds that plaintiffs have

demonstrated a likelihood of confusion. A finding of a likelihood of confusion gives plaintiffs'

probability of success on the merits a heavier weight in the balance.

[¶60]      **II.   Threat of Irreparable Harm**

[¶61]      Once a finding of a probability of success on the merits has been shown, a plaintiff

must also demonstrate a threat of irreparable harm to obtain a preliminary injunction. "In

-19-

evaluating the threat of irreparable harm, the court may . . . consider the potential loss of control over the quality of plaintiff[s'] services, the risk of damage to . . . plaintiff[s'] reputation and service mark from continuing use of an infringing mark." <u>Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.</u>, 793 F. Supp. 906, 918 (D. Minn. 1992).  When a likelihood of confusion exists, plaintiffs' lack of control over the quality of defendants' services constitutes an immediate and irreparable injury, regardless of the actual quality of those services.  <u>See Times Mirror Magazines, Inc. v. Las Vegas Sport News, L.L.C.</u>, 2000 WL 526779 *9 (3d Cir. 2000); <u>Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.</u>, 83 F. Supp. 2d 810 (S.D. Tex. 1999).  When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm.  <u>United Indus. Corp. v. Clorox Co.</u>, 140 F.3d 1175 (8th Cir. 1998) ("To obtain an injunction under section 43(a) appellees need only show that the falsities complained of had a tendency to deceive.")  Furthermore, when a probability of success on the merits exists, the court may presume irreparable injury. <u>See United Indus. Corp. v. Clorox</u>, 140 F.3d 1175, 1184 (8th Cir. 1998) (citing <u>Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.</u>, 997 F.2d 484, 489 (8th Cir. 1993); <u>Johnson & Johnson v. Carter-Wallace, Inc.</u>, 631 F.2d 186, 192 (2d Cir. 1980)).  In this case, plaintiffs have shown a probability of success on the merits.  Therefore, the court presumes irreparable harm to plaintiffs.

[¶62]   **III.   Balance of the Hardships**

[¶63]   The third requirement for obtaining a preliminary injunction requires plaintiffs to establish that their irreparable harm is greater than the hardship that a preliminary injunction would cause defendants.

[¶64]    Defendants contend that issuance of a preliminary injunction would put them out of business.  Plaintiffs argue that a preliminary injunction will not put defendants out of business, it would only disrupt defendants' ability to use the Chamber's marks and colorable imitations of those marks illicitly to engage in a narrowly proscribed activity, that of holding itself out to the public as the promoter or sponsor of the Rally and using the Chamber's marks to purport to sell sponsorships and to license vendors for the Rally's activities.

[¶65]    Evidence indicates that solicitation of sponsorships is a small percentage of the overall business and income of defendants.  For 1999, Sturgis Rally & Races, Inc., had an overall income of over $500,000.  The money distributed to the shareholders as a result of the sponsorships was $80,000.  Therefore, the court finds that a preliminary injunction would cause Sturgis Bike Week, Inc., a potential loss of less than 16 percent of its profits.  In addition, the court finds that the potential loss of profits would be even less than the 16 percent. Businesses that purchased a sponsorship package from Sturgis Rally & Races, Inc., when it was associated with the Chamber and the Foundation may not be inclined to purchase sponsorship packages now that the association has been terminated.

[¶66]    A preliminary injunction would not put Sturgis Bike Week, Inc., out of business. Other commercial activities of Sturgis Bike Week, Inc., include property management, producing t-shirts and caps and licensing those products under the Sturgis Bike Week trademark, printing schedules of the Rally's activities, printing the Sturgis Rally News Magazine, printing the Rally Guide, promoting the Sturgis Dragway, the Dark of the Moon Tour, the Governor's Tour, the Miss Sturgis Contest, soliciting sponsors for Sturgis Dragway and Rally Events, Inc., promoting spy cams on Main Street, and having a "Jumbotron" on Main Street.  Because there is a presumption of irreparable harm to plaintiffs and because the

-21-

issuance of a bond will substantially reduce any harm a preliminary injunction would cause

defendants, the court finds that the irreparable harm plaintiffs would suffer if injunctive relief

is denied is greater than the potential hardship to defendants if injunctive relief is granted.

[¶67]    **IV.   Public Interest**

[¶68]    The public interest is the final factor the court must balance in determining whether a

preliminary injunction should issue.  It has been said that "[o]nce the likelihood of confusion is

shown, it follows that the public interest is damaged if such confusion continues."  J. Thomas

McCarthy, 5 McCarthy on Trademarks and Unfair Competition, § 30.52 (4th Ed. 1997).  Some

courts define the public interest as the right of the public not to be deceived or confused.  See

Corning Glass Works v. Jeannette Glass Co., 308 F. Supp. 1321, aff'd, 432 F.2d 784 (2d Cir.

1970); Scientific Applications, Inc. v. Energy Conservation Corp. of Am., 436 F. Supp. 354

(N.D. Ga. 1977).  Others define the public interest as the effect granting or denying the

injunction will have on nonparties.  See  Eli Lilly & Co. v. Natural Answers, Inc., 86 F. Supp.

2d  834 (S.D. Ind. 2000); Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111

(7th Cir. 1997).  In this circuit, the court must weigh "the interest of protecting the public from

confusion or deception with the interest of facilitating a competitive market." Woodroast Sys.,

Inc. v. Restaurants Unlimited, Inc., 793 F. Supp. 906 (D. Minn.), aff'd,  994 F.2d 844 (8th Cir.

1992).  See also Calvin Klein, 815 F.2d at 504 ("[F]ree competition must be weighed against

any individual's property interest in that trademark, so that the analytic focus should also be on

the consumer's ability to obtain the lowest priced goods.")

[¶69]    Under the unique circumstances of this case, the court finds that the public's right not

to be confused or deceived outweighs the right to free competition.  In this case, Sturgis Rally

& Races, Inc., advertised in the Rally Guide and the Rally News Magazine for seven years that

the Chamber owned the logo and the marks and that profits from "official" products supported the Sturgis community programs.  Exhibit 35.  Hundreds of thousands of Rally attendees received those circulars over the years.  It is conceivable that tens of thousands of future attendees may buy Sturgis Bike Week, Inc.'s "official" products, expecting the proceeds to support the Sturgis community programs instead of supporting the defendants.

[¶70]     Furthermore, there is another public interest that must be considered.  It is the public interest of the Sturgis area residents who benefit considerably from the Chamber's sponsorship proceeds and its logo royalties.  From 1996 through 1999, the Chamber logo and sponsorship proceeds of $391,000 have been distributed to the following programs in the Sturgis community and others similar in nature:

> Black Hills Area Habitat for Humanity, Black Hills Highland Festival, CASA training, Cavalry Days Committee, Christmas Festival Committee, City (portable bleachers, watering system, bike path funding), panels and gates at the fairgrounds, petunias for the Community Pride Committee, Safety Days Camp for Farm Youth Committee, Fort Meade Band Stand, Fort Meade Museum, Girl Scouts, Ice Cream Social, Senior Transportation During the Rally, Meade Co. Literacy Program, Meade County Fair, Meade County Schools summer program, Missoula Children's Theater, National Motorcycle Museum, tarp for the baseball field, tree moving for the community center, community center sign, back-up batteries for the Rural Meade Ambulance Service, Salvation Army Food Cupboard, United States flags, Student of the Month program, softball field lighting, craft festival, Mid-Illinois Ballet, rebuild baseball dugouts, exercise equipment at the community center, "Just Say No" Program in Sturgis Elementary schools, Fireworks, Educational Materials and Smoke Detectors for the Sturgis Volunteer Fire Department, and Scholarships.

Exhibit16.  This is the public interest for which the Black Hills Motor Classic Consortium organized and incorporated[1]and this is the public interest for which Sturgis Rally & Races, Inc.,

---

[1]"The purposes for which this corporation is organized is to promote the City of Sturgis, South Dakota, and its environs by facilitating better planning, organizing and promoting of the City of Sturgis and the Black Hills Motor Classic Event."  Exhibit 1.

organized and incorporated.[2]  Therefore, this public interest must also be weighed and it weighs

heavily in favor of issuing the injunction in favor of plaintiffs.  The consortium and Sturgis

Rally & Races, Inc., originated because of the parties' desire to benefit the Sturgis residents,

but priorities changed  when hundreds of thousands of dollars were generated.  Accordingly,

the court finds that issuing a preliminary injunction serves the public interest.

[¶71]   **V.   Bond**

[¶72]     The court heard argument from counsel concerning the amount of a bond to be

required upon issuance of a preliminary injunction.  Plaintiffs suggested that a $10,000 bond

would be adequate, while defendants argued that $80,000 to $100,000, the amount of the 1999

sponsorships, should be the minimum bond required.  The court finds that a $10,000 bond

would not adequately compensate defendants for costs and damages should it be determined

that defendants were wrongfully enjoined.  The court also find that without the exclusive

assignment rights of the Chamber and City, it is unlikely that defendants would generate the

same sponsorship dollars.  Therefore, an $80,000 bond is too high.  The court finds that a

$40,000 bond would adequately compensate defendants should it be determined that they were

wrongfully enjoined.

---

[2]"The purpose for which this corporation is formed and exists is to promote the City of Sturgis, South Dakota, and its environs by facilitating better planning, organizing and promoting for the City of Sturgis and Black Hills Motor Classic Event."  Exhibit 2.

## CONCLUSIONS OF LAW

[¶73]    This court has jurisdiction pursuant to 28 U.S.C. § 1338(a), this being a civil action

arising under the trademark laws of the United States, namely, the Lanham Act, 15 U.S.C.

§§ 1051-1127.

[¶74]    Defendants have admitted that the Chamber's marks have attained secondary

meaning and are thus entitled to protection under the Lanham Act.  Defendants' continued use

of its Sturgis Bike Week logo and mark for anything other than sale of t-shirts and caps is

likely to cause confusion in the marketplace.  This conclusion is supported by the strength of

the Chamber's marks within the Sturgis and Rally attendee community, the direct competition

between the parties' services, the direct competition between the parties, defendants' intent to

confuse and the incidents of actual confusion.  Accordingly, plaintiffs have demonstrated a

likelihood of confusion and a probability of success on the merits of their trademark

infringement claim.

[¶75]    Whether a preliminary injunction should issue involves consideration of (1) the

probability that movant will succeed on the merits; (2)  the threat of irreparable harm to the

movant; (3) balance of the hardships; and (4) the public interest.  The findings in this case

satisfy this test.

[¶76]    The court has concluded as a matter of law that the November 15, 1999, settlement

agreement released the Chamber from all contractual obligations resulting from the 1992

Agreement Among Shareholders, the 1994 Consortium/Entity Agreement, and any implied-in-

fact contract between the parties, including the obligation not to solicit or "contract with . . .

any promoter or sponsor with which the Corporation has contracted with during the time [the

Chamber] was a shareholder. . . ."  Exhibits 108 & 114.

-25-

[¶77]     In light of the findings in favor of the plaintiffs on the issue of whether a preliminary injunction should issue, the court finds that defendants are not entitled to a preliminary injunction. Accordingly, it is

[¶78]     ORDERED that plaintiffs' motion for a preliminary injunction is granted (Docket 7);

[¶79]     IT IS FURTHER ORDERED that defendants, their agents, servants, employees, and attorneys, and any other persons or entities in active concert or participation with them are enjoined, pending the final determination of this action, from:

[¶80]     a.     Using the marks BLACK HILLS MOTOR CLASSIC, STURGIS
                  RALLY & RACES, and BLACK HILLS MOTORCYCLE RALLY
                  AND RACES in any form or any manner that is related to the
                  promotion or solicitation of sponsorships relating to the annual races,
                  rallies, and other motorcycle-related exhibits, promotions,
                  competitions, concerts, and related activities of the Rally or in the sale
                  of products;

[¶81]     b.     Using the Chamber's logo in any form or any manner that is related to the
                  promotion or solicitation of sponsorships relating to the annual races, rallies,
                  and other motorcycle-related exhibits, promotions, competitions, concerts, and
                  related activities of the Rally or in the sale of products;

[¶82]     c.     Using "Sturgis Bike Week" or the Sturgis Bike Week, Inc., logo in
                  any form or any manner that is related to the solicitation of official
                  sponsorships related to activities of the Rally;

[¶83]     d.     Using "Sturgis Bike Week" in conjunction with any services or goods other
                  than t-shirts and caps;

[¶84]   e.   Granting, or purporting to grant, any "official" or otherwise authorized sponsorships or vendor arrangements relating to the Rally.  Defendants are not enjoined from granting, soliciting, or authorizing official sponsorships for specific events only, such as the Sturgis Dragway, Rally Events, Inc., or any other individual events as requested by the specific event owners;

[¶85]   f.   Using any of the Chamber's marks, including BLACK HILLS MOTOR CLASSIC, STURGIS RALLY & RACES, and  BLACK HILLS MOTORCYCLE RALLY AND RACES, or its logo in passing off or inducing or enabling others to sell or pass off any services, Internet websites, or e-mail addresses that are not authorized by plaintiffs as services, websites, or e-mail addresses that are sponsored or endorsed by, or associated or affiliated with, plaintiffs, or either of them;

[¶86]   g.   Otherwise infringing any of the Chamber's marks or logo, otherwise unfairly competing with, injuring the commercial reputation of, or damaging the goodwill of plaintiffs or either of them in any manner, otherwise falsely representing themselves as being connected with, sponsored by, or associated with plaintiffs or either of them or otherwise engaging in unfair competition (including, without limitation, deceptive or unfair trade practices) which in any way injures plaintiffs or either of them.

[¶87]   IT IS FURTHER ORDERED that this order shall be effective upon plaintiffs' posting a $40,000 bond, pursuant to Federal Rule of Civil Procedure 65(c), for the payment of such costs and damages as may be incurred by defendants should it be determined that defendants have been wrongfully enjoined;

[¶88]    IT IS FURTHER ORDERED that within thirty days after plaintiffs post such bond, defendants shall file with the court a written description of the steps they have taken to comply with this order; and

[¶89]    IT IS FURTHER ORDERED that defendants' motion for a preliminary injunction is denied (Docket 17).

    Dated May 25, 2000.

                    BY THE COURT:

                    _Karen E. Schreier_
                    KAREN E. SCHREIER
                    UNITED STATES DISTRICT JUDGE